GOTHARD, Judge.
This is an oil and gas case. The plaintiff appeals the trial judge’s dismissal under La.C.C.P. art. 1672(B) of its suit for finder fees and royalty interest in the defendant’s well.
Audubon Exploration Consultants, Inc. (“Audubon”), the plaintiff, is a corporation of which Daniel Muhs is president and John Higgins is vice-president. Both men are geologists and are the sole shareholders of the corporation. Audubon developed an oil and gas prospect[1] in Cameron Parish, known as “Second Lake Prospect.”
The defendant is a partnership, Linder Oil Company, (“Linder Oil”) of which a geologist, Roger Linder, is president and the other partners are Miles Biggs, an attorney and land man, and Richard Gilmore, also a geologist. Linder Oil obtained from Liberty Oil a lease on 110 acres of land, which was also included in the Second Lake or Audubon prospect. In 1986, Linder Oil brought in a producing well within the Liberty Oil lease on a prospect known as “Grand Chenier,” or the “Broadbridge prospect.” Geologist David Broadbridge had developed the prospect while in the employ of Liberty Oil. Broadbridge and John Harlan had formed a partnership after leaving Liberty Oil in 1983 and had a retainer agreement with Linder Oil. The two men remained on good terms with Liberty’s president, James Moore.
The dispute between Audubon and Lin-der Oil involves an alleged conflict of interests over the two geological “ideas” or prospects, specifically that Linder drilled in a geographical and geological area that had previously been presented to it by Audubon. Audubon claimed that Linder Oil used the information in the Audubon prospect and owed it an override on the well’s production, alleging Linder received an unjust enrichment.
As stipulated between the parties, in November, 1985 John Higgins had met with Biggs and Gilmore and presented the Second Lake prospect to Linder Oil; two weeks later, Linder Oil declined the prospect by letter signed by Gilmore and returned Audubon’s maps and reports. Early in 1986, Roger Linder told Biggs he had learned that the 110-acre plot leased by Liberty was available and he had decided to drill the Broadbridge prospect, which he had seen earlier. Allegedly, James Moore, president of Liberty, had planned to drill the lease up until that time, hence Linder had disregarded the prospect. Biggs mentioned to Roger Linder the possibility of a conflict because he and Gilmore had reviewed the Audubon prospect in November. After considering the matter Linder concluded there was no conflict because of differences between the prospects as to location and depth.
In April, 1986 Muhs and Higgins learned that Linder Oil was planning to drill and arranged a meeting with Roger Linder to discuss what they perceived to be a con *1182 flict. Upon looking at the Audubon maps, Linder stated that he personally had not seen the prospect before, compared them against the Broadbridge maps, and said he would get back to them. After an attorney’s letter and a personal telephone call demanding compensation produced no results, Audubon filed suit on October 9, 1986, seeking $40,000 in finder fees, 3% overriding royalty interest of 8/8 ths. resulting from any production on the property, and attorney’s fees.
Trial was held on December 18 and 19, 1989. At the close of the plaintiff’s case, the defendant moved for dismissal under La.C.C.P. art. 1672(B). On December 21, 1989 the trial court signed a judgment dismissing the lawsuit, with reasons for judgment.
Audubon raises three issues: 1) whether the court erred in finding that Audubon’s prospect and the prospect purportedly relied upon by Linder were different; 2) whether, under an unjust enrichment analysis, Linder had the benefit of Audubon’s prospect when it drilled a well involving land and targeting subsurface mineral deposits virtually identical to those shown Linder by Audubon; and 3) whether the court erred in finding that the key lease necessary for the drilling of the well was unavailable at the time of Audubon’s presentation to Linder.

Were Audubon’s prospect and Broad-bridge’s Prospect Different?

The threshold issue of the case is whether or not the court’s factual finding regarding the similarity or not of the two prospects is correct.
The Supreme Court’s most recent summary of the manifest error rule appears in Lirette v. State Farm Ins. Co., 563 So.2d 850, 852 (La.1990), as follows:
It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, supra at 844; Canter, supra at 724; Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La. 1987); Boulos v. Morrison, 503 So.2d 1 (La.1987).
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); ... [Remaining citations omitted.]
Audubon called Daniel Muhs, Roger Lin-der, John Higgins, and expert geologist Louis Lamarie to testify. All the geologists agreed that petroleum geology is an inexact science. Muhs explained that the geologists’ predictions of where oil and gas might be found are based largely on the logs of wells previously drilled.
The court's decision was based primarily on the testimony of Louis Lamarie, qualified as an expert in geology and in oil and gas operations. Lamarie explained that although all geologists use the same material, e.g. well logs and base maps, a prospect is developed by interpretation. He said:
... [I]f you gave five geologists the same set of data, you’d probably get five different interpretations. They would all have some similarities but there’d be some differences....
In the case before us he felt that “the two sets of geological data represented the same prospect,” although there were slight differences in interpretation.
*1183 The trial judge gave the following reasons for finding that there was no conflict between the two prospects because of the differences:
1) The Grand Chenier prospect required drilling to 8,500 feet at the shallowest and 11,500 feet at the deepest as opposed to a range of 8,200 feet to 9,500 feet for the Second Lake prospect.
2) The Grand Chenier prospect “keyed off of” (i.e., was oriented from) a Tenne-co well as opposed to the Cox well used by the Two Lake prospect.
3) The well was dry past the 9,500 foot level, the deepest level required by the Second Lake prospect, but it produced at 11,400 feet, within the range required by the Grand Chenier prospect.
Our review of the testimony indicates Lamarie believed that, although the Broad-bridge maps extended to deeper strata than those of Audubon, at 8900 feet both sets of maps indicated oil and gas should be found. He interpreted Audubon’s written proposal as indicating that 8800 feet would be the minimum depth to consider drilling. Although the Linder prospect was “keyed off” or oriented from the Fifteen Tenneco-Nunez well while Audubon keyed off the Cox well, both prospects showed the Tenne-co-Nunez well as being on a northern dip. He went on to say that:
... by moving south of that well, you get higher [shallower] than that well, which means you would encounter unpro-duced carbons. That’s critical and that— you know, that’s one of the reasons we use the eighty-nine hundred foot sand that — from the Broadbridge map because it — that’s the thing it showed and that’s what in effect the Audubon map showed.... [T]here may be a number of key wells and the fact that you refer to a specific well doesn’t mean that you’ve ignored the factors in other wells.... and if by moving south, you get high, and that’s what the prospect revolved around.
Lamarie admitted that there are differences in the way the two prospects depicted faults, although the maps used in general the same faulting. Broadbridge showed the fault “down to the north” while Audubon showed it “down to the south.” He stated that there are some geological differences in the structures but that they were quite similar over all. Finally, the geographical locations overlapped considerably; and the Liberty lease and thirty-five acres adjoining it leased by Max Killgore for the Audubon prospect were essential to both prospects.
The appellant argues that the trial judge disregarded the similarities brought out by the Lamarie testimony, while the appellee contends that the court determined correctly the geological distinctions between the two prospects. The trial judge determined that the differences between the Broad-bridge and Audubon prospects outweighed the similarities. As we cannot say that his reasoning was clearly wrong, we must affirm his finding of fact.

Did Linder have the benefit of Audubon’s prospect under an unjust enrichment analysis?

Five elements must be established in order to prove an unjust enrichment:
1) There must be an enrichment; 2) there must be an impoverishment; 3) there must be a connection between the enrichment and the impoverishment; 4) there must be an absence of “justification” or "cause” for the enrichment and impoverishment; and 5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature.
Edmonston v. A-Second Mortgage Co. of Slidell, Inc., 289 So.2d 116, 120 (La.1974).
Audubon argues that Linder Oil was “enriched” by reviewing its prospect. It asserts that Linder received a benefit by using Audubon’s geological idea, even though it drilled the Broadbridge prospect; it was alerted to a competing interest in the area, corroborating an idea of which it already had knowledge and/or its geologist’s memory of a similar idea was jogged.
The impoverishment claimed is that Audubon’s prospect no longer existed once Linder had acquired the acreage and drilled the well.
*1184 The connection alleged between the enrichment and impoverishment is a conflict of interest “between Linder’s dual and competing duties to Broadbridge and to Audubon.” Linder’s duty to Audubon was to make certain that the company was not considering or had no prior interest in the geographical area before it agreed to see the Audubon prospect. Linder’s departure from the alleged “custom of the trade” created a conflict of interest, which somehow connected Linder’s enrichment to Audubon’s impoverishment.
The fourth requirement, an absence of justification or cause for the enrichment and impoverishment is considered by Audubon’s counsel as a separate issue, i.e. whether the Liberty lease was available when Audubon showed its prospect in 1985. Audubon argues: that the court’s finding that the lease was not available then is in error; that the right of first refusal to Harlan was not proved or “memorialized by a juridical act.” At the outset we point out that the verbal agreement was subject to a credibility call by the trial court and we find no manifest error in his ruling.
James L. Moore, president of Liberty Oil, testified that he intended to drill on the 110-acre lease himself but had given John Harlan his word that, “if I didn’t drill it, I would give him first shot at it.” Had he drilled on it himself, he would have given Harlan an override. He said that he had tried unsuccessfully to “put some deals together” in the prospect, believing that two wells would be desirable, but had not attempted to sell the acreage until Harlan approached him in 1986 and he assigned the Liberty lease to Linder Oil, just before it was due to expire. Audubon argues that only a written contract may justify an enrichment under the doctrine and therefore the promise of Moore to Harlan was ineffective as justification.
Finally, Audubon states that it has no other remedy at law, fulfilling the fifth requirement of the doctrine.
Linder Oil’s position, which we find to be valid, is that Audubon has failed to establish the five prerequisites to invoking an action in unjust enrichment. Assuming for argument that Lmder did receive an enrichment, a producing well, Linder avers that the alleged losses (the “impoverishment”) of Audubon are questionable, as Linder’s drilling disproved the existence of oil and gas in the sands mapped by Audubon; it had only a dry hole to sell.
Linder finds the most serious flaw in Audubon’s argument to be its failure to establish a connection between the enrichment and the alleged impoverishment. The connection between the economic benefit to one patrimony and the economic detriment to the other must have occurred “by direct transfer or indirectly through an intervening party, without any corresponding transfer of compensation intended to be adequate.” Tate, The Louisiana Action for Unjustified Enrichment: a Study in Judicial Process, 51 Tul.L.Rev., 446, 447 (1977). Roger Linder’s drilling was based upon a prospect independently developed by Broadbridge and there is no proof that he used Audubon’s geological concepts in any way. Therefore, there was no transfer from Audubon’s patrimony to Linder Oil’s. We point out that the factual issue of whether or not Linder Oil benefitted from Roger Linder’s review of Audubon’s materials turns on the truthfulness of Roger Linder’s testimony and we do not find the trial court’s assessment to be clearly wrong.
As to the fourth criteria, the absence of cause for the enrichment, Linder clearly bought and paid for Harbridge Petroleum’s geological idea by assigning Harbridge an overriding interest in production, as stipulated by the parties. A legal cause, therefore, justified the enrichment of Linder Oil.
In conclusion, we find no error in the trial court’s conclusions and affirm the decision in favor of the defendant.
AFFIRMED.

. Daniel Muhs defined a prospect as "a geological interpretation of data which delineates or pinpoints a previously undrilled accumulation of oil and gas which might be exploited.”